VT SUPERIOR COURT

STATE OF VERMONT

| | | |
|---|---|---|
| **SUPERIOR COURT** | 2015 OCT -5 A 9:47 | **CIVIL DIVISION** |
| **Washington Unit** | | **Docket # 769-12-13 Wncv** |

FILED

RANDY BERNO and JOANN BERNO,
  Plaintiffs

v.

SHANE FISK and CATHY FISK,
  Defendants

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This matter came before the court for final hearing on the merits on July 30, 2015. Plaintiffs are represented by Attorney Lauren S. Kolitch. Defendants are represented by Attorney Scott Fewell. Post-trial legal memoranda were filed.

Plaintiffs seek a declaration that the easement they hold across Defendants' land is fifty feet wide. Defendants acknowledge the existence of the easement, but claim that it is no more than twelve feet wide.

#### Findings of Fact

Plaintiffs Randy and Joann Berno are a married couple who own land in Duxbury. Defendants Shane and Cathy Fisk are a married couple who own adjacent land. The wives are sisters; the husbands are thus brothers-in-law. All are long-time residents in the Duxbury/Waterbury area.

The Bernos were married in 1973. In 1974, they owned a 10-acre parcel of land in Duxbury on which they built the home where they raised their children and still live. Over the years, Mr. Berno has acquired over 400 acres of additional land within a five-mile radius. He has been active in land and property management, and has been a member of the Duxbury Development Review Board.

Sometime after 2000, the Fisks were living in Waterbury Center and were looking to relocate to a place where they could have more land to raise animals. Mr. Berno and Mr. Fisk had conversations about the availability of a parcel of land in Duxbury called the Callahan Lot, which was a landlocked parcel identified as 48 acres. The parcel between the Callahan Lot and a public highway was land owned by Mr. Berno's mother. He expected that he was likely to become its owner at some point in the future. He also

1

held power of attorney for his mother. There was an old logging road used by VAST as a snowmobile trail, approximately 8-12 feet wide, that ran from Mr. Berno's mother's land through the Callahan Lot from south to north. It was not accessible by car. The two husbands discussed a plan for the Bernos to buy the Callahan Lot and sell a portion to the Fisks with an access easement across Mr. Berno's mother's land to the public road that Mr. Berno could acquire from his mother.

On June 5, 2002, the Bernos bought the Callahan Lot for $40,000. The low price reflected the fact that it was landlocked. On August 2, 2002, a deed was signed, and it was recorded on September 26, 2002, in which Mr. Berno's mother (by Mr. Berno under power of attorney) granted the Bernos a fifty foot wide easement across her land to provide access from the public road to the Callahan Lot. The instrument specifically granted the Bernos the right to create further tenancies in the fifty foot wide easement: "Said easement and right of way is for ingress and egress, and for utilities, either over or underground, to be used in common by the herein Grantees and their heirs, successors and assigns and the herein Grantees are specifically granted the authority to create further tenancies in said easement and right of way."

On August 27, 2002, the Bernos granted to Washington Electric Cooperative a thirty foot wide easement across the Callahan Lot to a location described and depicted on a related drawing as the "Fisk" house site. This was located at the southern end of the Callahan Lot, fairly close to the common boundary with Mr. Berno's mother, and on a spur off the VAST trail/logging road.

In October of 2002, the Bernos had a survey done of the Callahan Lot, which turned out to include 54 acres. The parties shared the cost of the survey equally although Mr. Berno gave the surveyor instructions about what to depict. He had the surveyor create a lot of 15 acres as a parcel to be conveyed to the Fisks (hereinafter "Fisk lot"). This was the most southerly portion of the Callahan lot, and the portion adjacent to Mr. Berno's mother's land and closest to the public road. It included the house site in the same location as depicted on the Washington Electric easement. It did not run along the entire width of the common boundary with Mr. Berno's mother's land.

The remainder of the Callahan Lot as shown on this survey consists of 38 acres north of the Fisk lot and a fifty foot wide swath connecting the 38 acres to Mr. Berno's mother's land along the western boundary of the Fisk lot. It is called in this decision the "Connector Strip." Mr. Berno testified that he expected to ultimately acquire his mother's land and he wanted the remainder of the Callahan Lot to be contiguous to his mother's land eventually in order that it could be taxed favorably as a single parcel. Mr. Berno had been on the Development Review Board for years and knew that in order to construct a house in Duxbury, a fifty foot wide right of way was needed. Thus, the Connector Strip also enhanced development potential of the remaining 38 acres.

The survey also depicts the fifty foot wide right of way across Mr. Berno's mother's land from the public road to the Fisk lot, and identified it as 50 feet wide and

2

shows measured boundaries and gives the deed reference of the easement deed that created it. In this decision, the location of where it enters the Fisk lot is called Point A.

The survey also shows a double dashed line running from Point A in a northerly direction across the Fisk lot to the remainder of the Callahan Lot to a point called in this decision Point B. It is identified on the survey plan as "Right of way along existing road bed to be retained by Randolph & Joann Berno." The double dashed line is clearly narrower than the other two fifty foot wide features shown on the survey: the right of way across Mr. Berno's mother's land, and the Connector Strip. The double dashed line is the location of the VAST trail and old logging road. The dispute in this case is over the width of this easement. This length of easement, from Point A to Point B, is called in this decision the DAR (disputed access road) for clarity to distinguish it from the fifty-foot wide easement across Mr. Berno's mother's land to the south, and another surveyed easement on the remainder of the Callahan Lot to be described later in these findings. Mr. Berno testified that he instructed the surveyor not to include a width for the easement in order to give flexibility.

The Bernos and Fisks executed a Purchase and Sales Agreement and Addendum. Both are undated, but it appears that both parties signed the Addendum, which cross-references the Agreement, in October of 2002. There is no clear description of the property to be conveyed. The Paragraph 4 entitled "Description of Real Property" gives the property address as Ryan Rd, Duxbury, and states "See attached property description." There is no attachment. Paragraph 10 states "Purchasers shall reimburse sellers for a proportionate share of the following expenses incurred by sellers in their acquisition of the property: permits, attorneys' fees, survey, property tax, recording fees, and transfer tax. Sellers' share shall be determined by the ratio of the subject property's acreage to the overall acreage owned by the sellers, which is 15/48." There is no mention of any easement.

The survey described above was recorded on December 4, 2002.

On January 2, 2003, the Bernos deeded to the Fisks the 15-acre Fisk lot for $12,500, subject to a few reservations. The first is:

> The herein Grantors, retain for themselves, their heirs, successors and assigns, specifically reserving the right to create further beneficiaries of same, an easement and right of way for access to retained land of the Grantors, said easement and right of way is shown, depicted, and identified as "Right of way along existing road bed to be retained by Randolph & JoAnn Berno" on the above referenced survey.

The description does not include a width nor any other terms affecting the easement. The deed also contains reservations for the first cut of timber and a right of first refusal. It does not contain a reservation for a utility easement to benefit any remaining land.

3

The Fisks then built their home, including constructing a driveway from the public road along the easement crossing Mr. Berno's mother's land and continuing on the DAR for a very short distance and continuing further on the spur off the DAR to the house site.

Mr. Berno did some clearing of trees along the fifty foot easement on his mother's land, and to some extent on the DAR. The Fisks acknowledged that the Bernos held an easement over the DAR to the remaining acreage of the Callahan Lot they owned to the north, and had no objection to the Bernos' use of the DAR or to clearing on it. The Fisks also used it to take wood out from the woods on their Fisk lot.

In 2004, Mr. Berno's mother died, and as a result of intra-family transactions, Mr. Berno became sole owner of his mother's former land. Thus, he owned his mother's former land and the adjacent remainder of the Callahan Lot, consisting of the fifty foot wide "Connector Strip" west of the Fisk lot and the remaining 38 acres of the Callahan Lot to the north.

Through this period the two families got along well with each other. In 2006, Mr. Berno and Mr. Fisk discussed buying another piece of adjacent land that became available, the 205-acre Villeneuve lot, and sharing the land. The Bernos bought it themselves. In the meantime, Mr. Berno continued to gradually work on the DAR. He cut more trees, did some grading, added gravel, put in some 20 foot culverts, and raised the roadbed by up to four feet in places. The travelled portion increased up 16 feet wide in places. Both families used the DAR to take out wood from harvesting trees.

In 2008-09, the Bernos applied to subdivide the remaining Callahan Lot into four parcels. The Fisks received notice of the proposed subdivision as adjacent owners but did not object and they did not attend the hearing on the application or the site visit. They had no objection to the subdivision. They were not aware that the application was based on use of a fifty-foot wide access road over the DAR. The application was approved on April 15, 2009 and there was no appeal.

The Bernos had a survey prepared in May of 2009, which was recorded on June 23, 2009. It showed that the access to the four subdivided lots on the 38 remaining acres of the Callahan Lot would be over the DAR as a fifty foot wide access road. The survey also showed a continuation into the Callahan Lot of an access road fifty feet wide to provide access to each of the four lots. A short section of the DAR is shown as fifty feet wide. Near it are two statements:

"Right of way over land of Fisk Book 86, Page 349. No width given." (This refers to the DAR.)
"Right of way over Grace and Berno from Town Highway 26 to Land of Fisk Book 85 Page 237. 50 feet wide." (This refers to the easement from the town highway to Point A across Mr. Berno's mother's former land.)

4

Mr. Berno began to do a lot of cutting in a wide swath along the DAR, cutting and removing trees well outside the width of the logging road/VAST trail. Mr. Fisk approached him to question the extent of the cutting, and Mr. Berno told him, "I have a 50 foot right of way, go check your deed." Mr. Fisk did check his deed and found that there was no width given for the easement over the DAR. Relations between the families deteriorated quickly.

At that point, the Bernos owned an easement across the Fisk lot by reservation in their deed to the Fisks that specifically allowed them to create additional tenancies in the future, but the width of that easement was not specified. They would not be able to use the DAR as an access road for the four subdivided parcels in the Callahan Lot unless they owned an easement fifty feet in width. They took the position that it was intended to be fifty feet wide. The Fisks took the position that it was only eight feet wide.

The Fisks put up pairs of stakes on each side of the DAR spaced about eight feet apart from side to side, indicating that the easement was only eight feet wide. They placed such pairs every 75 feet or so the entire length of the DAR. They also spray painted red lines on the road edges eight feet apart and spray painted "8 feet" showing the width with arrows spray painted on the ground. They used the DAR to take wood out at a spot where they broke down part of the elevated roadbed Mr. Berno had created. They also put a rock in the side of the DAR near where their driveway cuts off from the DAR so that the Bernos' equipment would not disturb their driveway, and put metal stakes in the ground eight feet apart on the road. Because the Bernos could not get heavy equipment in between the stakes to finish developing the road, they took the subdivided lots off the market.

In 2012, the Fisks tried to appeal the granting of the subdivision permit, but it was too late.

In 2013, the Bernos filed this suit, seeking a declaration that the width of the easement is fifty feet wide.

In 2014, the Bernos filed a new subdivision application for the Callahan Lot, but providing access to the proposed lots not over the DAR but over the fifty foot wide Connector Strip. The cost of developing the DAR to provide access to the four subdivided lots on the Callahan Lot would be $5,000. The cost of developing the Connector Strip as road access for the subdivided lots would be about $50,000, because of ledge and need for fill. Their application was approved. The Fisks appealed to the Environmental Division. Mr. Fisk testified that while they have no objection to the subdivision as long as it does not use the DAR for access to the lots, they appealed in order to "protect their interest."

Mr. Berno testified that prior to the Berno purchase of the Callahan Lot, he and Mr. Fisk had a conversation in which Mr. Berno said he would deed him a fifty foot right of way across his mother's land to the proposed Fisk lot and Mr. Fisk agreed to provide a fifty foot right of way for access (across Mr. Berno's mother's land) and keep a fifty foot

5

right of way (across the DAR to the remainder of the Callahan Lot). He (Mr. Berno) testified that he believed that it was not necessary to specify fifty feet as a width because the transaction was within the family. He testified that Mr. Fisk agreed to grant a fifty foot wide right of way across the Fisk lot.

Mr. Fisk denies that such a conversation ever took place. The agreement Mr. Berno claims is inconsistent with the survey he had prepared at the time of the subdivision of the Callahan Lot that created the Fisk lot. The width of the DAR as shown by the double dashed lines is clearly narrower than fifty feet. Furthermore, there is no evidence that either Mrs. Berno or Mrs. Fisk ever participated in any conversation about plans for such a property transaction, and both of them are parties to the Purchase and Sales Agreement and the Deed to the Fisk lot. The court does not find by a preponderance of the evidence that there was a conversation either between the two husbands, or one in which all parties were participants, in which the Fisks agreed that the easement across the Fisk lot would be fifty feet wide. While it is possible that Mr. Berno did make to Mr. Fisk the statement he testified that he made, that does not mean that the Fisks agreed to it or that any agreement became legally enforceable.

The court finds that at the time of the conveyance from Berno to Fisk of the Fisk lot, the average width of the DAR, then an old logging road with a roadbed used as a VAST trail, was no more than twelve feet wide.

## Conclusions of Law

The Bernos characterize their claims regarding the width of the DAR as breach of contract, promissory estoppel, equitable estoppel, reformation, and unjust enrichment. In short, they assert that the parties agreed that the DAR would be fifty feet wide and, even if they neglected to reduce that agreement to writing, in the deed or elsewhere, it would be unfair for the width to be any narrower. They ask the court to so find and reform the deed if necessary.

The deed is ambiguous insofar as the width of the DAR is not specified. The width thus must be determined "on all relevant evidence." *Kipp v. Estate of Chips*, 169 Vt. 102, 107 (1999). The evidence shows that the DAR, as it appears on the ground, is no wider than twelve feet. It is most reasonable to conclude that the parties intended the deed, which is silent on the issue of width, to convey the access easement as it appeared on the ground: twelve feet wide.

The Bernos claim, however, that the parties expressly, though orally, agreed that the DAR would be fifty feet wide and the Bernos relied on that agreement in conveying the property to the Fisks. As the court has found, however, the Bernos did not establish any such agreement by a preponderance of the evidence. Mr. Berno may have made a statement about width prior to the conveyance, but there was no proof that either or both of the Fisks ever agreed to it and the Bernos did not incorporate any such purported agreement into the 2002 survey, which appears to depict the DAR as it appears on the ground, not fifty feet wide.

6

Promissory estoppel does not fit the facts of this case. The promissory estoppel doctrine is commonly described as follows: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement (Second) of Contracts § 90(1), quoted in *Foote v. Simmonds Precision Products Co.*, 158 Vt. 566, 573 (1992). There simply was no promise made by the Fisks that the Bernos relied on to their detriment.

The Bernos have not proven equitable estoppel either. The elements of equitable estoppel are as follows:

> [F]irst, the party to be estopped must know the facts; second, the party being estopped must intend that his conduct shall be acted upon or the acts must be such that the party asserting the estoppel has a right to believe it is so intended; third, the latter must be ignorant of the true facts; and finally, the party asserting the estoppel must rely on the conduct of the party to be estopped to his detriment.

*Fisher v. Poole*, 142 Vt. 162, 168 (1982). The Bernos did not prove that the Fisks knew that the Bernos believed that the DAR was going to be fifty feet wide and intended by their silence to induce the Bernos to persist in their wrong belief to their detriment. There is no basis for equitable estoppel in this case.

Reformation refers to correcting the language of a contract or deed so that it says what it should rather than what it does. It is a remedy rather than a claim on its own. See, e.g., Restatement (Second) of Contracts § 166 (misrepresentation justifying reformation). There is no basis for reformation in this case.

The easement is twelve feet wide. It was conveyed as it existed on the ground. There is no unjust enrichment. While the Bernos may have conveyed the property to the Fisks, along with related easements, for less than what they may have received in an arms-length transaction with a third party, that was their choice. It did not create a right, legal or equitable, in them to later alter the terms of the bargain.

The Bernos also seek the following: (1) an order compelling the parties to survey and record the DAR and share the expense for doing so; (2) declaratory relief establishing that the centerline of the traveled way as it appears on the ground is the correct location of the centerline; (3) an order compelling the Fisks to remove the stakes and the rock they placed in the DAR; (4) an order compelling the Fisks to grant a utility easement to Washington Electric for the Bernos' benefit; (5) an order declaring that the "way be for all forms of locomotion and vehicular traffic"; (6) an order declaring a maintenance-cost allocation formula proportionate to how far each party travels the DAR from Rt. 100; and (7) a permanent injunction preventing the Fisks from interfering in the future with the Bernos' right to use the DAR.

7

The first request is denied on the grounds that there is no legal or evidentiary basis for ordering the Fisks to incur such an obligation or expense. The second request is denied. The only evidence about the location of the DAR is as shown on the survey recorded on December 4, 2002. There was no evidence that there was any dispute about the accuracy of that depiction. To the extent that Plaintiffs seek a declaration of the location of the DAR, it is as shown on that survey.

The third request is granted to the extent that no stakes or stones may be placed within the twelve-foot width of the easement. The fourth request is denied as there is no legal or evidentiary basis for the granting of such a request.

The fifth request is granted, as the evidence showed no dispute about the type of vehicle that may be used on the DAR as long as it remains within the easement width. The sixth request is denied as there is no legal or evidentiary basis for such relief. The final request is granted with respect to the twelve-foot wide easement.

## ORDER

Based on the foregoing, Plaintiffs' counsel shall prepare a form of Judgment. Defendants' counsel shall have five business days to file any objection to its terms.

Dated at Rutland, Vermont this 30th day of September 2015.

Mary Miles Teachout
Superior Judge

8